1

2

3                    **IN THE UNITED STATES DISTRICT COURT FOR THE**
                              **EASTERN DISTRICT OF CALIFORNIA**
4

5  **MARIA CARRILLO,**              )          **No. CV-F-06-634 OWW/GSA**
                                    )
6                                   )          **MEMORANDUM DECISION GRANTING**
                                    )          **IN PART AND DENYING IN PART**
7                **Plaintiff,**     )          **DEFENDANTS' MOTION FOR**
                                    )          **SUMMARY ADJUDICATION OR**
8            **vs.**                )          **SUMMARY JUDGMENT (Doc. 31)**
                                    )
9                                   )
   **CITY OF FRESNO, et al.,**      )
10                                  )
                                    )
11               **Defendant.**     )
                                    )
12  _____)

13      **Plaintiff Maria Carillo, represented by Juan Falcon, filed a**

14  **Complaint pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986 and**

15  **1988 against the City of Fresno, Fresno Police Chief Jerry Dyer,**

16  **Fresno Police Officer David Coan, and Does 1-100, arising out of**

17  **her arrest on April 12, 2005.**

18      **Defendants move for summary adjudication or summary judgment**

19  **on all claims alleged by Plaintiff on the grounds (1) Plaintiff's**

20  **arrest was supported by probable cause; (2) any force used to**

21  **effect the arrest was reasonable; (3) Officer Coan is entitled to**

22  **qualified immunity from liability; (4) the City is not liable to**

23  **Plaintiff in the absence of a violation of Plaintiff's**

24  **constitutional rights; (5) the City of Fresno maintained no**

25  **custom, policy or practice of constitutional violations and did**

26  **not act with "deliberate indifference"; and (6) Plaintiff's**

                                    1

supplemental state law claim fails in the absence of a constitutional violation.

This motion was heard on August 6, 2007. The motion was continued because of the Declaration of Juan Falcon:

> 3. On July 25, 2007, I supplemented Plaintiff's responses to Request for Production of Documents. The documents consisted of Plaintiff's medical records from University Medical Center. Specifically, a radiological report indicates that Plaintiff suffered two (2) broken ribs on April 20, 2005. Plaintiff alleges that as a result of her arrest and contact with Officer Coan on April 20, 2005, she suffered two broken ribs.

Discovery was re-opened solely concerning this medical evidence. Defendant's discovery and supplemental motion for summary judgment were ordered to be filed by October 15, 2007. Plaintiff's reply was ordered to be filed by October 25, 2007. The parties timely complied with this briefing schedule.

A. GOVERNING STANDARDS.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Materiality is determined by the substantive law governing a claim or a defense. *Id*. The evidence and all inferences drawn from it must be construed in the light most

2

favorable to the nonmoving party.  *Id.*

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id.*  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id.*  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment."  *Id.*

1      **B.   <u>FACTUAL BACKGROUND</u>**.

2      Defendants submit the following statement of undisputed

3   material facts.   Except where noted, these facts are undisputed

4   by Plaintiff.[1]

5      <u>UMF 1</u>

6      Prior to April 12, 2005, Plaintiff had been seen taking

7   recyclables from City owned-bins on Holland Street.

8      By Declaration filed in opposition to the motion, Plaintiff

9   denies this fact, averring that, prior to April 12, 2005, she did

10  not take recyclables from City owned-bins on Holland Street.

11     Defendants object to consideration of Plaintiff's

12  declaration because Plaintiff's declaration is not signed by

13  Plaintiff but by her attorney, Juan Falcon.

14     Plaintiff's failure to sign her declaration requires that

15  the declaration be disregarded as evidence.   Because, however,

16  Plaintiff testified at her deposition to the same effect, *see*

17  *infra*, this fact is disputed.

18     <u>UMF 2</u>:

19     Plaintiff had been previously warned that it was illegal to

20  remove property from City-owned bins.

21     This fact is undisputed.

22     <u>UMF 3</u>:

23  _____

24     [1]Defendants further contend that all of their facts are deemed
    admitted by Plaintiff's failure to respond to the Requests for
25  Admission or to make a motion to be relieved of the deemed
    admissions.   However, in a footnote to their opening brief,
26  Defendants assert that they will not rely entirely on these
    Admissions.

                                    4

Plaintiff knew that it was illegal to remove recyclables from City-owned bins.

This fact is undisputed.

UMF 4:

At about 10:00 a.m. on April 12, 2005, Plaintiff was seen removing recyclables from City-owned bins on Holland Street.

Plaintiff disputes this fact, referring to pages 40:25-41:12 of her deposition where she denies she ever took any recyclable from City-owned bins, and to page 24:17-20 of her deposition that the recycling bins were not outside for pickup.

Defendants object to Plaintiff's references to her deposition testimony because of her failure to lodge the relevant pages of the deposition with the Court as required by Rule 56-260(b), Local Rules of Practice: "The opposing party shall be responsible for the filing with the Clerk of all evidentiary documents cited in the opposing papers."

While Defendants' objection is technically sound, Defendants lodged Plaintiff's entire deposition when they moved for summary judgment.  Plaintiff's deposition states:

> Q.  Are you saying there were no bins out on the street?
>
> A.  There were none.  They don't take them out there until the evenings for the following day.  (DT 24:17-20)
>
> ...
>
> Q.  Do you remember why you were arrested?
>
> A.  That's what I want to know.  I wasn't even stealing.  I wasn't doing anything.

5

Q. Did you know that they were accusing you
of stealing?

A. That's why I don't know.  I was not
stealing.  I was walking.

Q. Okay. I know you were not stealing.  But
did somebody tell you you were stealing?

A. If somebody told me?

Q. Yes.  Did somebody tell you that?

A. No. No. I wasn't doing it.  There's no
reason for them to say anything like that to
me.  (DT 40:25-41:12).

Defendants' technical objection is waived.  This fact is
disputed.

**UMF 5**:

Plaintiff ignored Officer Coan's request that she return
recyclables to the City owned bins.

Plaintiff disputes this fact, relying on her declaration in
which she denies removing any recyclables from City owned bins on
April 12, 2005 and wherein she avers that "Officer Coan did not
speak to me in Spanish language on April 12, 2005, other than the
words 'no casa, jail carcel."

Defendants object to consideration of Plaintiff's
declaration because it is not signed by Plaintiff.  *See supra.*
Because Plaintiff provides no reference to her deposition
supporting the averment in her declaration, this fact is
undisputed.

**UMF 6**:

Plaintiff "assumed" that the officer was asking her to place

1  a bottle in her shopping cart.

2      This fact is undisputed.

3      **UMF 7**:

4      Plaintiff put the bottle in her cart and began walking away,

5  saying "No, Honey, I go home."

6      Plaintiff disputes this fact, referring to page 31 of her

7  deposition:

8          Q.  Did you say you wanted to go home?

9          A.  Since he was not understanding me, we
            were not understanding each other.  The only
10          thing that I was able to say to him, I said -
            I said 'my home,' and what I meant was that I
11          was on my way home.

12          Q.  Okay.  Just for the record, did you say,
            'my home' in English?
13
            A.  Well, yes, I said that just in case he
14          would understand me.

15          Q.  Those are the only English words you
            spoke, 'my home'?
16
            A.  Well, yes.  That was the only thing.  (DT
17          31-32)

18      This fact is undisputed.

19      **UMF 8**:

20      Officer Coan placed Plaintiff under arrest for petty theft

21  with no more force than handcuffing.

22      Plaintiff disputes this fact, referring to her deposition at

23  36:14-20:

24          MR. PRAET: Q.  When you say you opened up the
            area, did you get a cut there?
25
            A.  Something popped inside.  And I felt that
26          something opened inside like this.  Two

7

1      broken ribs.

2      Q.  Did somebody tell you you had two broken
      ribs?

3

      A.  The doctor.  It came out on the x-rays
4      right away.  (DT 36:12-19).

5    **UMF 9**:

6    Because Plaintiff possessed no identification, Officer Coan

7 was unable to cite and release her at the scene.

8    This fact is undisputed.

9    **UMF 10**:

10    Instead of sitting in the rear of the police vehicle,

11 Plaintiff stiffened her body and dropped to the ground.

12    Plaintiff disputes this fact, referring to her deposition at

13 pages 35 to 36:

14      Q.  And did he - did he gesture for you to
      sit down in the car?
15

      A.  I couldn't bend my knees.  It's not that
16      I was resisting.  I have my hands held like
      this.  I have arthritis.  And my knees swell.
17

      Q.  Did you tell him you have arthritis>
18

      A.  He was not going to understand.
19

      Q.  Did you say anything to him.
20

      A.  Nothing.  I was just complaining that I
21      wasn't able to do it.

22      Q.  Were you complaining in Spanish?

23      A.  Yes.  But without saying anything.

24      Q.  How were you complaining without saying
      anything?
25

      A.  Well, I would just yell and cry.
26

8

1       Q.  Did you try to sit down in the car?

2       A.  Well, I couldn't get in.

3       Q.  Okay.  Did you - did you try to sit down?

4       A.  I tried to get in, but I wasn't able to do it because of my hands.  Because of the
5       entrance is too small.

6       Q.  Did you fall to the ground?

7       A.  Well, when he was trying to bend me over, well, I just went down on my face.

8

       Q.  So, was he trying to help you get in the
9       car by bending you?

10       A.  Bend me over like this in order to get me in.
11

       Q.  And that's when you fell?
12

       A.  Well, yes, maybe he let me go, I believe.
13

       Q.  And how did you fall?
14

15       A.  How would I know?  I just fell on my chest.  And I hit myself on my chest.  And I
16       opened up this area.  (DT 35-36)

17   <u>UMF 11</u>:

18   Plaintiff's perception of this fall was that Officer Coan

19 simply let go of her while assisting her into the police car.

20   This fact is undisputed.

21   <u>UMF 12</u>:

22   At no time did Officer Coan hit, kick, choke, shove or use

23 any force other than handcuffing.

24   This fact is undisputed

25   <u>UMF 13</u>:

26   At no time did Officer Coan use any bad or obscene language,

1    nor did he raise his voice or yell.

2        This fact is undisputed.

3        **UMF 14:**

4        There is no medical evidence that plaintiff suffered any

5    broken ribs or other serious injury as a result of this incident.

6        At the August 6th hearing, Plaintiff belatedly  submitted a

7    report from Dr. Justin Williams dated April 20, 2005, which notes

8    "two recent rib fractures" and related x-ray films.   Defendants

9    deposed Dr. Williams and have attached his deposition to their

10   supplemental memorandum.   Defendants also submit a Declaration

11   executed by Dr. Williams after his deposition was completed.   Dr.

12   Williams testified at his deposition in pertinent part as

13   follows:

14            BY MR. PRAET:

15            Q.  Why don't you tell me what you're [sic]
                 observations were of the films for Mrs.
16               Carrillo.

17            A.  Well, I identified some old healed rib
                 fractures and some new fractures, which I
18               characterized as ... recent.

19            Q.  Okay.  Let me first ask you about the old
                 healed rib fractures.  When you say 'old,'
20               are we talking something in excess of a year
                 from the date of these views?
21
              A.  A year or more, yeah.
22
              Q.  Now, I know from her deposition that she
23               had indicated that she was apparently run
                 over by a tractor and suffered some rib
24               fractures.  Would that be consistent?

25            A.  Yes.

26            Q.  Okay.  Then I think your report indicates

                              10

1
2

something about more recent fractures.  Do you get specific as to which specific rib fractures?

3
4

A.  Well, I said there were fractures in the 6th and 10th ribs on the left.

5
6

Q.  Now, prior to coming here for the deposition, did you view the films to refresh your memory as to those fractures?

7

A.  Oh, yes.

8
9
10
11
12

Q.  All right.  Mrs. Carillo is alleging that she was in a confrontation with a police officer on April 12, 2005, which would be approximately eight days prior to you taking and analyzing these views.  The ... more recent fractures in the 6th and 10th ribs that you described as being more recent, in your opinion ... could they have occurred as recently as April 12th of 2005 based on the views taken on the 20th?

13
14
15
16

A.  Well, the 6th rib, I couldn't characterize.  The 10th rib clearly had to be many weeks old because it showed signs of early healing.  You can't see those signs short of a number of weeks, even in the healthy young individual.

17
18
19
20

Q.  She was in her early 70s at that time.  So given the degree of healing that you observed on at least the 10th rib that you described as more recent, would it be fair to say that that fracture, the more recent fracture in the 10th rib was at least a month old in somewhat of that age [sic]?

21
22

A.  I would go six or eight weeks more likely.  People heal at different speeds, but no one shows that amount of healing in a week.

23
24
25

Q.  Okay.  So in your medical opinion, the fracture in the 10th rib that you described in your April 20th report as more recent, could not in any circumstance have occurred on April 12, 2005?

26

A.  No.

11

1    Q.  No it could not have been?

2    A.  It could not.

3    Q.  Okay.  And you're certain of that?

4    A.  Absolutely.

5    Q.  So it had to have occurred weeks prior to April 12, 2005?

6

7    A.  Yes.

8    Q.  And the fracture in the 6th rib that you described in your report ... as being more recent along with the 10th rib, would you have expected those two more recent fractures to have occurred simultaneously?

9

10

11    A.  Well, I can't tell that from looking at them.  You are making an assumption that there is one traumatic event that breaks some ribs and not repeated rib fractures on different dates.

12

13

14    Q.  Is it a question of the quality of the films or the views that does not allow you to be as ceratin with respect to the 6th rib?

15

16    A.  I guess I would characterize it as the position of the fracture relative to the views that are taken.

17

18    ...

19    Q.  Okay.  Is there any way to say to any degree of medical certainty that the 6th rib was the result of an incident on April 12, 2005?

20

21    A.  No, I don't think so.

22    Q.  ... [C]an you say from any of these views that the recent fracture that you identified in the 6th rib occurred within a day or two of April 12, 2005?

23

24    A.  No.

25    Q.  Can you say that it occurred at or about the time of the recent fracture in the 10th

26

12

rib other than more likely just from
presumption?

A.   No, I didn't [sic].

Q.   Can you say whether it occurred after
April 12th, but prior to April 20th?

A.   No.

Q.   What is it about the 6th rib fracture
that tells you it's recent however?

A.   Well, the sharpness of the break,

Q.   Someone of Mrs. Carillo's age, a woman in
her early 70s, is she more or less prone to
rib fractures?

...

A.   Much more.

Q.   Okay.   Why is that?

A.   Because they lose calcium from their
bones beginning in their 30s and unless they
take steps, which really weren't available
until very recently to reverse that process,
they lose the mineral from the bone, which
means it loses strength.

...

Q.   So someone such as Mrs. Carrillo in her
early 70s, simply losing her balance and
falling to the ground, could that be enough
to cause these rib fractures?

A.   I think so.

Q.   It wouldn't necessarily take any sort of
external blow or strike or anything like
that?

A.   I don't think so, no. [DT 10:11-16:5]

...

[BY MR. KERLEN]

13

1   Q.  You testified that the 10th rib fracture
    is likely to be at least six to eight weeks
2   old?

3   A.  Yes.

4   Q.  Is it possible it could have been eight
    days old?  Is that any way possible?
5
    A.  No.
6
    Q.  Okay.  On the 6th rib fracture, the X-ray
7   that was taken on April 20th, 2005, is it
    possible that it could have been fractured on
8   April 12th of '05?

9   A.  It could have not.

10  Q.  Okay.  And from the x-ray of the 10th rib
    on the April 20th, '05 x-ray, would it show
11  on the 10th rib - would it show a new break
    or re-injury on the 10th rib, if it was
12  reinjured? ... If the 10th rib was injured
    six to eight weeks prior from [sic] April
13  20th, and the 6th rib was more recent, a more
    recent fracture than the 10th rib, is it
14  possible that 10th [sic] rib could have been
    re-injured or re-fractured, would that show
15  it in the x-ray?

16  A.  The only thing which would be a re-
    fracture because the fracture hadn't healed.
17  Could it be re-injured at the site of the
    previous fracture that isn't healed?  Yes, it
18  could.

19  Q.  And would that show anything?

20  A.  You would not be able to see it, no.

21  ...

22  [BY MR. PRAET]

23  Q.  Doctor, is it anything more than pure
    speculation to say that the 6th rib fracture
24  occurred on April 12th, 2005?

25  A.  No.

26  Q.  It is pure speculation?

                              14

A.  It would be pure speculation, yeah.

Q.  So there's no medical evidence to say it occurred on or about April 12th of '05?

A.  No.

...

[BY MR. KERLEN]

Q.  I mean, there must be a time frame when healing starts happening like you explained on the 10th rib.  So there's a time period obviously if it did not start showing healing when it was actually fractured; so the time period must before April 20th when the x-ray was shown [sic].  I mean, it must be somewhat likely to have occurred between a particular time frame.  From looking at the April 20th x-ray, what particular time frame would you expect the rib fracture number six to be in?

A.  I would expect it to be within the same time frame as the 10th rib, but because of the way in which we're seeing it, I wouldn't expect to see the same evidence of healing there because ... it just presents itself to me in a different view.  I'm not sure what I can compare that to.  It's just a different view of something that may have the same thing happening to it because you have a different view of it.  It has a different appearance to it.

Q.  Right.  So it would be pure speculation to say what date the actual fracture took place; correct?

A.  Correct.

Q.  But it wouldn't be pure speculation to say that it could have occurred ... six to eight weeks prior to April 20th, but it also could have occurred on April 12th?

A.  Well, it could have occurred April 18th, yes.

...

15

1       [BY MR. PRAET]

2       Q.  If I understand you, the reason you can't date the 6th rib fracture with the same

3       degree of certainty [as the 10th rib fracture] is because of the view that you see

4       in these films?

5       A.  Correct.

6       Q.  In other words, would it be fair to say that the 6th rib may in fact have the same

7       degree of healing present?  It's just that these views don't show that?  Is that fair?

8       A.  Yes.

9

10      Q.  Okay.  So if you had a different view of the 6th rib, you would perhaps expect to see the same degree of healing as you see in the

11      one view of the 10th rib?

12      A.  Yes.

13      Q.  That would allow you to date the 6th rib fracture to the same degree of certainty as

14      you have the 10th?

15      A.  Yes.

16      Q.  And your experience would suggest to you that the two rib fractures more likely

17      occurred simultaneously, which would have been six to eight weeks prior to April 20th,

18      is that fair?

19      A.  Yes.

20      Q.  Okay.

21      A.  Although that relates to my question of whether she falls down a lot.

22

23      Q.  That unfortunately, I cannot answer.

24      A.  You don't know?

25      Q.  I don't know.

26      ...

16

1    [BY MR. KERLEN]

2    Q.  Because we don't have another view of rib
     number six, it would be pure speculation for
3    you to say that fracture number six and
     fracture number 10 occurred at the same time;
4    correct?

5    A.  Correct.

6    Q.  Okay.

7    A.  Yeah.  I mean, I work on the assumption
     that people tend to have discrete injuries
8    and not repetitive injuries that they don't -
     I mean, there are people that tip over a
9    great deal.

10   ...

11   Q.  Is it a possibility that the rib six
     fracture occurred after the rib ten fracture?
12
     A.  Yes.
13
     Q.  Okay.  Now, is it a possibility then that
14   if it was a different fracture to number six
     than number ten ... that rib ten was re-
15   fractured when rib number six was re-
     fractured?
16
     MR. PRAET: That assumes facts not in evidence
17   that ten was refractured.

18   ...

19   Q.  The question is: Is it a possibility?

20   A.  If it's re-fractured, it could have
     happened at the same time.  Counsel is
21   correct that we have no evidence that it is a
     re-fracture of a fracture that occurred eight
22   weeks ago.

23   ...

24   [BY MR. PRAET]

25   Q.  Given the medical records and the films
     that we have, is there anything that would
26   allow you or anyone else in your business to

                           17

come up with any more certainty as to the
date of the 6ᵗʰ rib fracture, given what you
have?

...

A.  Okay.  I don't believe so. [DT 19:12-
26:3]

In a Declaration executed in September 2007, Dr. Williams avers

in pertinent part:

2.  Shortly after the conclusion of my
deposition testimony and after counsel for
Mrs. Carrillo had quickly departed, it
occurred to me that Mrs. Carillo's fractures
of the 10ᵗʰ and 6ᵗʰ ribs were entirely
consistent with a woman of her age and size
leaning into a recycling container which
would apply pressure to the torso.  It is my
understanding that Mrs. Carillo frequently
engaged in the practice of retrieving
recyclables and this conduct would provide a
reasonable and logical explanation for the
recent rib fractures detected on April 20ᵗʰ,
2005.

3.  As I testified in my deposition, the
recent fracture of the 10ᵗʰ rib I detected on
April 20, 2005, showed signs of healing and
have absolutely occurred weeks prior to her
contact with Fresno Police on April 12, 2005.
Although the X-ray films precluded me from
determining whether or not the fracture to
the 6ᵗʰ rib showed similar signs of healing,
it is highly likely that the fractures to the
10ᵗʰ and 6ᵗʰ ribs occurred at the same time
(i.e. several weeks prior to April 12, 2005).
It has been my professional experience that
multiple rib fractures typically occur in a
single episode and it would be highly
unlikely that the recent fractures to the
10ᵗʰ and 6ᵗʰ ribs occurred on two separate
occasions.

Plaintiff contends that, although Dr. Williams' testimony is

not favorable, it is not fatal to her case because of his

testimony that it is possible that the injury to the 6ᵗʰ rib

18

1  occurred after the injury to the 10th rib.

2      **UMF 15**: **The only injury Plaintiff suffered was as a result**

3  **of her fall.**

4      This fact is undisputed.

5      **UMF 16**:

6      **Plaintiff suffered no financial damage and incurred no**

7  **medical or other costs.**

8      This fact is undisputed.

9      C.   <u>**QUALIFIED IMMUNITY**</u>.

10     Officer Coan moves for summary judgment on the ground of

11  qualified immunity.

12     Qualified immunity serves to shield government officials

13  "from liability for civil damages insofar as their conduct does

14  not violate clearly established statutory or constitutional

15  rights of which a reasonable person would have known."  *Harlow v.*

16  *Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has set

17  forth a two-pronged inquiry to resolve all qualified immunity

18  claims.  First, "taken in the light most favorable to the party

19  asserting the injury, do the facts alleged show the officers'

20  conduct violated a constitutional right?"  *Saucier v. Katz*, 533

21  U.S. 194, 201 (2001).  If the court determines that the conduct

22  did not violate a constitutional right, the inquiry is over and

23  the officer is entitled to qualified immunity.  However, if the

24  court determines that the conduct did violate a constitutional

25  right, *Saucier*'s second prong requires the court to determine

26  whether, at the time of the violation, the constitutional right

19

was "clearly established."  *Id*.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.  This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.  *Id*. at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces.  If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable.  If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense."  *Id*. at 205.  In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.  *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"').  Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

> It is important to emphasize that this

20

inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201.  As we previously said in this very context:

'[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.  Yet, that is not enough.  Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'  ...

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner* ... In so doing, it was mistaken.  *Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality.  See *Graham v. Connor*, *supra*, at 396 ('"[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application"').  Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom. Scarrot v. Wilkins*, 543 U.S. 811 (2004):

21

> **Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.** *See Saucier*, **533 U.S. at 216 ... (Ginsberg, J., concurring)('Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street,** *Graham* **will not permit summary judgment in favor of the defendant official.').**

**One of Plaintiff's claims is that Officer Coan used excessive force in effecting her arrest.**

**All claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment set forth in** *Graham v. Connor*, **490 U.S. 386 (1989) and** *Tennessee v. Garner*, **471 U.S. 1 (1985).** *Motley v. Parks*, **432 F.3d 1072, 1088 (9th Cir.2005). "Determining whether the force used to effectuate a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."** *Graham*, **490 U.S at 396:  This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."** *Id.* **The most important of these factors is the threat posed by the suspect.** *Smith v. City of Hemet*, **394 F.3d 689, 702 (9th Cir.**

22

2005).   The "broad discretion that must be afforded to police officers who face a tense situation," must be extended to mistakes of fact concerning "the existence of probable cause" as well as to mistakes as to what the law requires under particular circumstances.   *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Graham,* 490 U.S. at 396.   The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."   *Id*. at 397. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances."   *Hammer v. Gross*, 932 F.2d 842, 848 (9th Cir.), *cert. denied sub nom. City of Newport Beach, Cal. v. Hammer*, 502 U.S. 980 (1991).   As explained in *Forrester v. City of San Diego*, 25 F.3d 804, 807-808 (9th Cir.1994), *cert. denied*, 513 U.S. 1152 (1995):

> Police officers ... are not required to use the least intrusive degree of force possible. Rather ..., the inquiry is whether the force used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene ... Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.

23

The court's consideration of whether a particular use of force is reasonable "must make allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a given situation", *Graham*, 490 U.S. at 396-397 (not every push or shove, even if it may later seem unnecessary in hindsight violates the Fourth Amendment).  Proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Officer Coan argues that he is entitled to qualified immunity with regard to Plaintiff's claims of excessive force. He contends that all eyewitnesses and Plaintiff agree that he never used any force beyond handcuffing and that Plaintiff's fall was either self-induced or the result of his inability to hold onto Plaintiff as he attempted to assist her into the rear of his vehicle.  He contends that such force was minimal.  Even though the governmental interest in stemming the theft of recyclables may be minimal, Officer Coan argues that it is undisputed that Plaintiff ignored several warnings and that he intended to do little more than issue her a citation once her identity was verified at the police station.

1    Even if, *arguendo,* Officer Coan's actions could be construed
2  as excessive force within the meaning of the Fourth Amendment,
3  Officer Coan argues that it would not have been clear to a
4  reasonable officer that his conduct was unlawful in the situation
5  he faced.  Officer Coan argues that "it is inconceivable that any
6  reasonable police officer facing the same circumstances would
7  believe that the minimal act of handcuffing a less than
8  cooperative suspect as they attempted to walk away from an arrest
9  could somehow be clearly unlawful."  Finally, Officer Coan
10  argues, even if he is not entitled to summary judgment on the
11  first two prongs of *Saucier*, he is entitled to summary judgment
12  that he reasonably, but mistakenly believed that his conduct did
13  not violate a clearly established constitutional right:

> Officer Coan has stated and, it is widely
> accepted, that handcuffing is a standard
> procedure in the arrest of virtually every
> suspect and virtually every police officer
> would reasonably agree.  The undisputed facts
> are clear that Plaintiff was only handcuffed
> long enough to take her to the station so
> that her identity could be established and
> she could be released on citation.

19    No evidence suggests that Officer Coan used force against
20  Plaintiff.  Plaintiff fell as she was being assisted by Officer
21  Coan into the back of the police car; there is no evidence that
22  Officer Coan caused her to fall.  Plaintiff's initial memorandum
23  in opposition to the motion on this consisted entirely of cases
24  discussing the standards governing resolution of a motion for
25  summary judgment.  Plaintiff did not address in any way the
26  grounds upon which Defendants move for summary judgment or argue

that the disputed facts preclude summary judgment on the issue of qualified immunity or any other ground.  In her supplemental brief, Plaintiff addresses the issue of qualified immunity with regard to her claim that she was arrested without probable cause. The supplemental brief does not address the excessive force claim in any way.  Summary judgment is GRANTED on the issue of excessive force.

Officer Coan argues that he is also entitled to qualified immunity with regard to Plaintiff's claim that she was arrested without probable cause.  Probable cause to arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the plaintiff] had committed a crime. *Beier v. City of Lewiston*, 354 F.2d 1058, 1065 (9th Cir.2004). The proper inquiry where an officer is claiming qualified immunity for a false arrest claim is "whether a reasonable officer could have believed that probable cause existed to arrest the plaintiff."  *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir.2002).  Qualified immunity does not depend on whether probable cause actually existed.

Officer Coan points to the evidence that he and two eyewitnesses saw Plaintiff removing recyclables from City-owned bins, which afforded a reasonable basis for him to believe that Plaintiff was committing theft.

In her supplemental brief, Plaintiff argues that Officer Coan is not entitled to qualified immunity with respect to the

26

issue of probable cause:

> The facts in this case do not suggest a fair probability that a crime occurred because no criminal charges were ever filed against Plaintiff.  The Fresno County District Attorney declined to prosecute because of the insufficiency of the evidence relating to a crime.  A reasonable officer in this occasion would not have believed that a crime occurred.  Therefore, Defendants are not entitled to qualified immunity.  Plaintiff would still be entitled to present evidence relating to a malicious prosecution claim relating to her detention, false arrest and imprisonment on April 12, 2005, and no criminal charges being brought after her arrest.

The issue is not whether there was sufficient evidence to charge Plaintiff with a crime but, whether a reasonable police officer in the field would have believed that Plaintiff had committed a misdemeanor in his presence.  Defendants again refer to the Declarations of Officer Coan, and independent eyewitnesses Joan Brindeiro and Betty Wells, that they saw Plaintiff picking through the city-owned bins on April 12, 2005 at 10:00 a.m. in the 3300 block of East Holland.  Defendants also refer to Plaintiff's deposition testimony:

> Q. ... [H]ow much recyclables did you have in your heart [sic] when the policeman stopped you?
>
> A.  A whole bunch.
>
> Q.  Was it over the top?
>
> A.  Yes, I was carrying a big bag.
>
> MR. FALCON: He wants to know if your cart was full.
>
> THE WITNESS: Yes, it was. [DT 25:9-17]

27

1          ...

2          Q. ... Did - when the police officer said
           something on the microphone, did you
3          understand anything he said?

4          A.   No, but I thought that he was talking to
           someone else.
5
           Q.   Did you see someone else?
6
           A.   No.  But at the time I turned, I saw the
7          bottle laying on the street, and I thought
           perhaps for sure he's telling me for me to
8          pick it up, and I did.

9          Q.   And what did you do with it?

10         A.   I put it in my cart.  It was laying on
           the street.  What could I do with it? [DT
11         30:6-18].

12     Although Plaintiff denies taking the recyclables, she was in

13 the area with, by her own admission, a cart full of recyclables.

14 This is consistent with the testimony of Officer Coan and the two

15 other witnesses.  However, Plaintiff also refers to her

16 deposition testimony that the city-owned recycling bins were not

17 out in the area of the incident at the time of the incident.

18     Because the fact whether Plaintiff took recycling materials

19 from city-owned bins is disputed, summary judgment for Officer

20 Coan on the issues of probable cause to arrest and qualified

21 immunity is DENIED.

22         D.   **LIABILITY OF CITY OF FRESNO AND CHIEF OF POLICE**

23 **JERRY DYER**.

24     *Monell v. New York City Dept. of Social Services*, 436 U.S.

25 658 (1978) authorizes direct suits against local government units

26 under Section 1983 where "the action that is alleged to be

                              28

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 at 690-691. "Moreover, ... local governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*  Since "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort[,] ... a municipality cannot be held labile solely because it employs a tortfesor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Id.* at 691.  A municipality will be liable under Section 1983 only if "the municipality itself causes the constitutional violation at issue."  *Canton v. Harris*, 489 U.S. 378, 385 (1989).  In order to assert a *Monell* claim, plaintiff must establish: (1) a violation of constitutional rights occurred; (2) the existence of a municipal policy or custom; and (3) a causal nexus between (1) and (2). *Canton, id.* at 385-386; *see also City of Los Angeles v. Heller*, *id.* 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

Plaintiff presents no evidence to support liability against the City under *Monell* and its progeny.  Plaintiff conceded at the

29

hearing that she has no such evidence.

Plaintiff conceded at the hearing that she has no evidence from which it may be inferred that Defendant Chief of Police Jerry Dyer had any involvement in the April 12, 2005 incident between Plaintiff and Officer Coan.

Summary judgment for the City of Fresno and Chief of Police Jerry Dyer is GRANTED.

E.   <u>STATE LAW CLAIMS</u>.

Plaintiff's Complaint alleges causes of action for interference with civil rights in violation of California Civil Code §§ 43, 51 and 52.1 based on the alleged actions described above.

Plaintiff does not dispute that the same standards are applied in determining whether a violation of the California statutes has occurred as is applied in connection with the federal civil rights claims.

Because summary judgment for Defendants is granted with respect to Plaintiff's claim of excessive force in violation of the Fourth Amendment, summary judgment for Defendants is GRANTED to the extent that Plaintiffs' state law claims are based on excessive or unreasonable force.  Conversely, summary judgment for Defendants is DENIED to the extent Plaintiffs' state law claims are based on the absence of probable cause to arrest Plaintiff.

The Complaint also alleges claims for intentional infliction of emotional distress, negligence *per se*, and negligent

infliction of emotional distress/negligence.  Defendants do not move for summary judgment on any of these claims.  Consequently, the merits of these claims for relief are not addressed.

The elements of the tort of intentional infliction of emotional distress are (1) outrageous conduct by the defendant, (2) intent to cause or reckless disregard of the probability of causing emotional distress; (3) severe emotional suffering; and (4) actual and proximate causation of emotional distress. *Bartling v. Glendale Adventist Medical Center*, 184 Cal.App.3d 961, 970 (1986).  "Outrageous conduct" is conduct which is so extreme as to exceed all bounds of decency and which is to be regarded as atrocious and utterly intolerable in a civilized community.  *Id.*

"'Negligence per se' is an evidentiary doctrine codified at Evidence Code section 669.  Under subdivision (a) of this section, the doctrine creates a presumption of negligence if four elements are established: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."  *Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256, 1285 (2006).  "[T]he doctrine of negligence per se does not establish tort liability.

31

1 Rather, it merely codifies the rule that a presumption of

2 negligence arises from the violation of a statute which was

3 enacted to protect a class of persons of which the plaintiff is a

4 member against the type of harm that the plaintiff suffered as a

5 result of the violation." *Id.* "Even if the four requirements of

6 Evidence code section 669, subdivision (a), are satisfied, this

7 alone does not entitle a plaintiff to a presumption of negligence

8 *in the absence of an underlying negligence action.*" *Id.*

9 There is no independent tort of negligent infliction of

10 emotional distress. *Potter v. Firestone Tire & Rubber Co.,* 6

11 Cal.4th 965, 984 (1993). Rather, the tort is negligence. *Id.*

12 <u>CONCLUSION</u>

13 For the reasons stated above:

14 1. Defendants' motion for summary judgment or summary

15 adjudication is GRANTED IN PART AND DENIED IN PART:

16 a. Summary judgment for Defendants City of Fresno and

17 Chief of Police Jerry Dyer is GRANTED;

18 b. Summary judgment for Defendant David Coan is

19 GRANTED as to Plaintiff's claims for excessive force in violation

20 of the Fourth Amendment and California law.

21 c. Summary judgment for Defendant David Coan is DENIED

22 as to Plaintiff's claims of unlawful arrest in violation of the

23 Fourth Amendment and California law.

24 2. Counsel for Defendants shall prepare and lodge a form of

25 order that the rulings set forth in this Memorandum Decision

26 within five (5) days following the date of service of this

1  **decision.**

2      IT IS SO ORDERED.

3  **Dated:    November 14, 2007**              /s/ Oliver W. Wanger
                                        UNITED STATES DISTRICT JUDGE